[Civ. No. 806.   Third Appellate District.—September 8, 1911.]

## LINDER HARDWARE COMPANY, Respondent, v. PACIFIC SUGAR CORPORATION, Appellant.

Contracts—Novation—Substituted Obligation—Rules.—Where the novation of the contracts sued upon is claimed, which entirely changed the rights and relation of the parties as to all the contracts embraced in the action, such claim of novation presupposes a previous obligation for which a new one is substituted. Novation is made by contract, and is subject to all the rules governing contracts in general.

Id.—Defense of Novation—Burden of Proof.—Where the defense of novation is pleaded in the answer as to a change in the terms of each of the contracts sued upon, the burden of establishing such defense is upon the defendant.

Id.—Action for Labor and on Assigned Account and Note—Defense of Payment in Sugar—Conflicting Evidence—Support of Findings.—It is held, upon a review of the evidence in the action upon a contract, and upon an assigned account, and an assigned note, that the defense of a novation as to each contract sued upon, by an alleged agreement of each contractor with defendant to accept payment in sugar instead of money, was not proved without substantial conflict in the evidence, and that there is sufficient evidence in favor of the plaintiff to support the findings for the plaintiff, and a recovery by him in money.

Id.—Evidence—Agreed Order upon Defendant in Favor of Plaintiff for Part of Debt.—The court properly admitted an agreed order upon defendant by the employee for part of the sum due to him by defendant in favor of the plaintiff which was made with the consent of the defendant. The law in regard to the splitting of demands has no application in such case, to preclude the admission of the order.

Id.—Note Payable to Corporation—Indorsement of Corporate Name by Treasurer—Possession of Plaintiff—Pleading—Evidence.—Where a note was payable to a corporation, was indorsed in the name of the corporation by its treasurer, and its assignment was denied in the answer, it is held that its possession by the plaintiff at the trial, and its introduction in evidence by him was properly allowed. (Beatty, C. J., Dissenting.)

Id.—Rule as to Possession of Negotiable Paper—Prima Facie Evidence of Delivery and Ownership.—Possession of commercial paper with indorsement makes a prima facie case of delivery by the indorser to the holder and of ownership of the latter; and the

17 Cal. App.—6

delivery was *prima facie* established by plaintiffs' production and proffer of the note.

APPEAL from a judgment of the Superior Court of Tulare County, and from an order denying a new trial. W. B. Wallace, Judge.

The facts are stated in the opinion of the court.

Bradley & Bradley, and Gray, Barker, Bowen, Allen, Van Dyke & Jutten, for Appellant.

G. W. Zartman, and Power & McFadzean, for Respondent.

CHIPMAN, P. J.—Plaintiff seeks to recover from defendant on three separate counts: For goods sold and delivered, $3,407.47; on an account for labor, alleged to have been assigned to plaintiff, $2,000; on a promissory note alleged to have been executed by defendant to Studebaker Brothers Company and assigned to plaintiff, $2,370.15. A fourth, based on a promissory note, was dismissed as not then due.

The defendant did not deny the purchase of the goods, the performance of the labor or the execution of the note, but, by amended answer, set up certain separate defenses: 1. That a new contract of novation was entered into between plaintiff and defendant whereby payment of the obligation sued upon was postponed and payment was to be made in sugar, thereafter to be manufactured by defendant, instead of in cash; and that performance under the new contract was not due when the action was commenced. 2. That plaintiff acquired ownership of the claim for labor only as a result of the contract of novation; that said claim was part of a larger claim owing at the time to one Hibama, and, as matter of law, this demand could not be split up without defendant's consent, to which it did not consent except by novation. 3. The assignment of the Studebaker promissory note is denied.

The findings of the trial court were in favor of plaintiff and judgment was entered for the several items, aggregating, with attorneys' fees and interests, $8,179.29. Defendant appeals from the order denying its motion for a new trial and from the judgment.

The principal proposition discussed in appellant's brief is thus stated: "The evidence established a contract of novation which entirely changed the rights and relations of the parties as to all the items embraced in the action." In short, the claim is that plaintiff agreed that defendant might pay its obligations in sugar instead of in money. Novation presupposes a previous obligation for which the new one is substituted. It is made by contract and is subject to all the rules concerning contracts in general. (Civ. Code, secs. 1530, 1532.) In the present case it is pleaded in defense and the burden of establishing it was on the defendant. The soundness of appellant's contention can only be tested by an examination of the evidence adduced at the trial, and this involves the necessity of stating it with some fullness.

It appears that plaintiff is a mercantile house doing business at the city of Tulare, and defendant was one of its customers. Defendant is engaged in growing sugar beets and manufacturing them into sugar, having one factory at Visalia, Tulare county, and another at Corcoran, in Kern county. At the time the action was commenced defendant was indebted to plaintiff on an open account for merchandise amounting to $3,407.47. Defendant was also indebted to one Hibama for work and labor done in the field, in the year 1908, in the sum of over $2,000. Hibama was also indebted to plaintiff for an amount in excess of this sum. He gave plaintiff an order on defendant for $2,000, which plaintiff credited to Hibama's account and charged it to defendant's account. On March 29, 1909, defendant executed its promissory note to the Studebaker Brothers Company for the sum of $2,370.16, which it is alleged was assigned to plaintiff prior to the commencement of the action. These three demands constituted the basis of the action.

There were but three witnesses called in the case—Mr. Linder, of plaintiff company; Mr. Cole, of defendant company, each concededly authorized to speak and act for his respective corporation; and Mr. Hibama, witness for plaintiff, with whom defendant contracted for certain labor. Mr. Cole's testimony was taken by deposition.

Witness Linder testified to the amount of the open account of his company against defendant for the year 1909 up to the commencement of the action, which was July 26, 1909, and

that the statement as shown was presented to defendant and was correct, amounting to $3,407.47, no part of which has been paid. We do not understand that the amount of this indebtedness is questioned by defendant, nor, for that matter, either of the other demands. The witness next testified that he received the following order from Mr. Hibama on the sugar company:

"$2,000.00.                    Tulare, Cal., April 30, 1909.

"At three days' sight pay to the order of Linder Hardware Co. two thousand and no/100 dollars and exchange value received and charge the same to account of
                              "HENRY HIBAMA.

"To Pacific Sugar Corporation,
           "Corcoran, Cal."

The instrument was received in evidence over defendant's objection that no proper foundation had been laid and that it was irrelevant and immaterial. The witness testified that the order was afterward presented to defendant—"sent through the bank"—the response being "No funds." He testified: "I had a conversation with Mr. Cole with reference to this order. At that time or shortly afterward Mr. Cole expected to make arrangements with the Crocker National Bank to pay all outstanding indebtedness, and that was one of the first things to be taken care of after they had made the arrangement. That was what Mr. Cole said. At the time plaintiff received this order from Henry Hibama he was indebted to the plaintiff in a sum considerably over $2,000." Over defendant's objection witness testified that "plaintiff gave Mr. Hibama credit for that and charged it up to the sugar company," and that no part of it has been paid. A promissory note dated March 29, 1909, for $2,370.16, payable to the Studebaker Brothers Company, signed "Pacific Sugar Corporation, by Jacob Adloff, President, Attest, W. C. Petchner, Secretary," to which the corporate seal was affixed, "indorsed on the back thereof as follows: 'Studebaker Brothers Company of California, by Chester W. Weaver, Treasurer,' " was shown the witness, being the note set out in the complaint. Witness testified: That prior to this the indebtedness between the Studebaker Brothers Company and defendant was an open account and the matter was turned over to witness for adjustment. He "took the note

from the Pacific Sugar Corporation for the Studebaker people.'' He testified: ''The note was first taken from the sugar people and sent to San Francisco and they made the indorsement on it and mailed it to me and returned it to me, perhaps within two or three days. Just made the assignment and returned it to me. Q. Was the indorsement on the back of the note at the time it was turned over to you? A. Yes, sir.'' The note was admitted in evidence over defendant's objection that it was ''irrelevant, immaterial and incompetent, no proper foundation laid, no proof of assignment.'' Witness testified further: ''I afterward notified the Pacific Sugar Corporation that plaintiff was the holder of that note by verbal notice to Mr. Cole, and I think to Mr. Petchner, too, at one time prior to filing the suit. Mr. Petchner I think was secretary of the defendant company. No part of that indebtedness has been paid.'' On cross-examination the witness testified: ''The officer of the defendant with whom I conducted these negotiations leading up to the first transaction about which I testified, the Hibama transaction, was Mr. Cole. I did not have any talk with Mr. Cole at that time about the payment of the two thousand dollar obligation of Hibama in sugar. The first real conversation had about sugar was after we brought suit. There was no discussion except in a casual way before we brought suit, nothing definite, no agreement at all.''

Witness Hibama testified: That he did certain work for defendant in 1908, for which he presented a statement, given in the record and admitted by defendant to be correct. It showed an indebtedness of defendant to witness, on October 15, 1908, of $6,678.14. To this was added a further indebtedness, subsequently incurred in that year, of $751.09 for chopping wood, making in all $7,429.23, all of which he testified was owing to him shortly after October 15, 1908. A payment of $500 was made December 28, 1908, and another of $250 on January 15, 1909; that on April 30, 1909, he gave the order in question to plaintiff and credited it to defendant's account and plaintiff credited it on the account of witness. He testified further that, on April 30, 1909, defendant gave him a draft for $500, and that the balance of $2,179.23, due for 1908, was paid in July, 1909. The statement of account also included an unpaid balance for labor

in 1907. Upon cross-examination he testified: "In my testimony I said I had given credit to the Pacific Sugar Corporation for $2,000 on the Linder Hardware Company. I got nothing in writing from the defendant to show that credit. I simply gave that credit on my own books. I asked Mr. Cole for payment at that time. He told me he made some arrangement with the Linder Hardware Company so he wanted me to make $2,000 order on the Linder Hardware Company, so I did. Mr. Cole was the vice-president of the sugar company. . . . Mr. Cole told me at the time the subject of this $2,000 order was discussed between him and me that he had arranged with the Linder Hardware Company to pay the amount in sugar. He told me that he made arrangement with the plaintiff to sell the sugar, so he wanted me to make something, do something, an order. I did not talk about that transaction with Mr. Linder. I just made out an order. Mr. Cole was the one who first asked me to make out the order. I then took it to Mr. Linder and he accepted the order. I told Mr. Linder Mr. Cole wanted me to do that way. Q. Did you tell him that Mr. Cole said that arrangements were made so that payment would be made in sugar? A. Well, I didn't say, just didn't say it. Q. You didn't say it? A. No, sir. Q. What did you say about the sugar? A. Mr. Cole told me, he told me he made arrangement to sell his sugar to the Linder Hardware Company." On redirect, he testified: That he had previously asked Mr. Cole for money and was told he had no money and that the statement of the account he had presented referred to the year 1908. "Q. And this order that you gave to Mr. Linder was for part of the money that was due you for 1908?" To which objection was made as immaterial and that the order is the best evidence. The witness answered: "Yes, sir; 1908, on the old account."

Witness Linder was recalled for cross-examination and testified: As to the item of $203.50 each for Studebaker wagons, in plaintiff's bill of particulars, that the wagons were ordered from the San Francisco house of Studebaker Brothers Company and were received by them May 17, 1909; that the wagons were shipped from the factory on May 29th and arrived at Tulare June 14th; that they were not shipped from the east but came from San Francisco; that they have

a factory in South Bend, Indiana, and a house in San Francisco. "It was from the San Francisco house the wagons were ordered." He further testified that the wagons were delivered to defendant and went into use.

Witness Cole testified at considerable length, much of his testimony being upon matters not necessary to be stated. In substance his testimony was: That he had a conference with Mr. Linder in April, 1909, about the purchase of Studebaker wagons, which resulted in the purchase, after about a month, during which interval he and Mr. Linder had several interviews. At these meetings Mr. Linder explained to him that he owned an account held by the Studebakers against defendant, and the account of plaintiff against defendant was also spoken of, as also was the Hibama account against defendant; that witness proposed that all these claims be paid in sugar, including the Studebaker and Hibama indebtedness, of which latter $2,000 was to be assigned to plaintiff and paid in sugar. "The sugar was to be purchased in the regular way through some jobber—Mr. Linder fully understood the reason for that. We manufacturers could not sell direct to retailers without disturbing trade conditions, but we could deliver this sugar to him through any wholesale dealer whom he might select. I explained this fully to Mr. Linder. The sugar was to be sold at the San Francisco wholesale prices, plus the freight to Tulare, . . . and enough sugar was to be delivered in this way to the plaintiff to pay these accounts, that is, the Linder Hardware Company and the Hibama account and also the account for the purchase of the new wagons. . . . Delivery of the sugar was to be made during the manufacturing season at the convenience of both parties." He testified that he explained to Mr. Linder that certain creditors had prior claims on the sugar to be produced that season, naming them, in amounts aggregating about $280,000; that at that time they "were very hopeful of having a large crop"; that there was no other discussion between witness and Mr. Linder "with reference to the purchase of these wagons or any arrangement other than the payment in sugar in that way. I think I told Mr. Linder we had no money and would have to pay those bills out of our crop," and that the agreement was not reduced to writing during these negotiations. He testified: "I considered

that the agreement was made orally, and Mr. Linder sent for me one day and wanted me to enter into a written contract. I am not able to say definitely when that took place, but it was subsequent to the arrangement''; that the transaction was fully understood and fully completed before the contract was drawn up; that Mr. Linder was to prepare the contract, ''and if his draft was not satisfactory he would amend it or change it. This was either after the factory had started or about the time it started.'' It elsewhere appeared that the factory at Corcoran started up about July 15, 1909. He testified further that Mr. Linder's attorney prepared a draft of the contract which was presented to defendant. A copy of this contract was introduced and, as originally drawn, bore date July 19, 1909, but there was a clause ''seeking to bind Mr. Poindexter, the trustee, to the delivery of the sugar, which defendant informed Mr. Linder would prevent the ratification by defendant. (Mr. Poindexter, apparently, was in charge of the factories for creditors.) Certain changes were made by interlineation by Mr. Petchner. It appears that the directors of defendant did not sign this contract until after the present suit was brought, and also that the defendant never communicated to plaintiff its willingness to sign it. (The action was commenced July 26, 1909.) Witness testified further: That after the suit was begun he offered to return the wagons. ''Q. On the assumption that a mistake might have been made as to the terms of this agreement, was it, or what was the purpose of making such tender? A. My idea was that if we disagreed, the best thing to do was to try and straighten the matter out and that seemed to be the way to do it—to give him back his property.'' On cross-examination he testified: That this offer was after the wagons had been in use and after suit brought on these claims; that ''the only offer of sugar was made after the suit was begun,'' and that Mr. Linder was not satisfied with the samples; that ''they were not up to standard''; that other samples were offered and Mr. Linder went to his bins and brought out a sample of such sugar as he was selling and pointed out the difference between the two samples ''as to color''; Mr. Linder also stated that if defendant ''would give him such sugar as the customers would take he was ready to take the sugar. Q. Did you ever offer him any sugar before or after the trial that

he would accept as being merchantable? A. I never presented any further samples because the conclusion was the matter was in the courts and the bond had been given for the attachment and the members of our board were not willing for me to do anything further in the matter." It appeared that defendant did not produce enough sugar during the season to meet the preferred claims; that defendant had some sugar of the 1908 run which was not subject to the lien of preferred creditors and the samples offered to plaintiff were of this sugar which Mr. Linder said was not merchantable. "The sample of sugar that defendant expected to be able to deliver was not acceptable to him by reason of the color. That is the only time defendant ever offered him sugar, and that was after the suit was brought."

On redirect Mr. Linder testified: "I think I recollect the circumstance of a conversation between myself and Mr. Cole and Mr. Zartman (defendant's attorney) as detailed as taking place sometime along during the middle of the month of July. The conversation as far as I remember now was this: They were to pay up last year's account and all current business was to be paid out of the money coming from the Crocker National Bank. After the mortgage went on record, and we didn't get anything, of course I was willing to take anything else. That led up to the sugar proposition. Then it was that defendant proposed to give plaintiff sugar. I instructed Mr. Zartman to draw up a memorandum of agreement as to furnishing plaintiff sugar from that time on. I never heard anything more of that agreement. Nobody ever offered any sugar to me or gave me any sugar. I requested sugar a number of times. Q. And never received any? There never was any compliance with those requests? A. Not in merchantable goods."

It is urged that the testimony of Mr. Cole shows beyond controversy the establishment of a novation and that there is no substantial conflict between his testimony and that of Mr. Linder; that "Mr. Linder does not *directly* contradict any statement made by Mr. Cole, and there is not necessarily any indirect contradiction, as the testimony of Mr. Linder may all be true in its material features and yet not necessarily inconsistent with the material statements of Mr. Cole."

After all is said of this testimony, the one dominant ques-

tion of fact is, Did the parties mutually agree that all the items of indebtedness should be paid for in sugar and not in money? As to this vital fact, did the minds of the parties meet in May, as testified to by Mr. Cole, and was that mutually conceded to be the fact governing the parties in their subsequent dealings with each other? Is there, indeed, no substantial conflict in the testimony given by these witnesses and must we conclude that "the testimony of Mr. Linder may all be true in its material features and yet not necessarily inconsistent with the material statements of Mr. Cole"?

Mr. Cole testified that he had several interviews with Mr. Linder "stretching over nearly a month . . . before the arrangement was fully completed. I think it was some time in May when I gave the orders for the wagons." It is shown that the order was given May 17th, but the wagons were not delivered until June 14, 1909. The Hibama order was given April 30, 1909, and when returned "no funds," Mr. Linder testified that he had a conversation with Mr. Cole with reference to it, and that at that time "Mr. Cole expected to make arrangements with the Crocker National Bank to pay all outstanding indebtedness, and that was one of the things to be taken care of after they had made the arrangement. That was what Mr. Cole said." This was after the date Mr. Cole says he explained fully to Mr. Linder that the defendant had no money and could only pay in sugar. This was also after the date fixed by Mr. Cole when he commenced negotiations with plaintiff for the purchase of the wagons, which' he said was in April. With reference to the Hibama transaction as to which Mr. Cole testified that it was included in the contract to pay in sugar, Mr. Linder testified "I did not have any talk with Mr. Cole at that time about the payment of the two thousand dollar obligation of Hibama in sugar. The first real conversation we had about sugar was after we brought suit. There was no discussion except in a casual way before we brought suit, nothing definite, no agreement at all." This was brought out on cross-examination, and it seems to us to be in sharp conflict with the testimony of Mr. Cole on a very substantial issue in the case—indeed, the vital issue.

As late as the middle of July a conversation took place between Mr. Linder and Mr. Cole. Of this Mr. Linder testified:

"They were to pay up last year's account and all current business was to be paid out of the money coming from the Crocker National Bank. After the mortgage went on record (the Crocker mortgage) and we didn't get anything, of course I was willing to take anything else. That led up to the sugar proposition. Then it was that defendant proposed to give plaintiff sugar: I instructed Mr. Zartman, I believe, to draw up a memorandum of agreement as to furnishing plaintiff sugar from that time on. I never heard anything more of that agreement. Nobody ever offered any sugar to me or gave me any sugar."

It is true that Mr. Linder was not called upon, while on the witness-stand, to admit or deny specifically and definitely the various facts testified to by Mr. Cole, but we find it impossible to say, as defendant says we may, that Mr. Linder's testimony "may all be true in its material features and yet not necessarily inconsistent with the material statements of Mr. Cole." A legitimate inference may be drawn from Mr. Linder's testimony that there was no agreement that these claims should be paid in sugar up to the middle of July and that the agreement then reached was to be put in writing, which was, by Mr. Linder's direction, so done, but it was not ratified by defendant as submitted, but was changed in some material respects and, after this suit was brought, was signed by defendant as thus changed, but plaintiff was not notified nor was a copy sent plaintiff, though submitted in duplicate. In fact, as Mr. Cole testified, the bringing of the suit terminated the negotiations. We do not feel called upon to analyze the testimony further or examine into other features which might lend support to the findings. Suffice it to say, that a substantial conflict is shown as to facts material to the issues and that it cannot be said that defendant has sustained the issues presented in its special defense without substantial conflict.

2. As to the Hibama order, the evidence is that it was made by Mr. Cole's direction and with his consent and, as defendant failed to establish its point that this indebtedness was the subject of the novation claimed, the discussion as to the law governing the splitting of demands need not be noticed. The evidence as to this order and the order itself were admissible.

3. We do not think defendant can escape its liability on the Studebaker note on the only ground urged, that there was no proof of its assignment. The evidence is that this note was given in adjustment of defendant's account with the San Francisco house and it was by defendant delivered to plaintiff; it was sent to San Francisco and came back in two or three days with the assignment indorsed on it. This assignment was by the corporation named as payee, by its treasurer; it was in plaintiff's possession at the trial and put in evidence. Defendant knew that plaintiff held this obligation, and it was part of the indebtedness made the subject of negotiations between plaintiff and defendant, as testified by Mr. Cole. We think it was rightly admitted in evidence. Possession of commercial paper, with indorsement, makes a *prima facie* case of delivery by the indorser to the holder and of ownership of the latter. In *Pastene* v. *Pardini,* 135 Cal. 431, [67 Pac. 681], the court said: "The delivery was *prima facie* established by plaintiff's production and proffer of the note." See note to *Bedell* v. *Herring,* 77 Cal. 572, [11 Am. St. Rep. 323, 20 Pac. 129], where the cases are collected. The proposition there laid down and supported by numerous cases is thus stated: "It is well established that the mere possession of a negotiable instrument by the indorsee, or by the transferee where no indorsement is necessary, imports *prima facie* that he is the lawful owner, and that he has acquired it before maturity, *bona fide,* for value, in the usual course of business, and without any circumstances impeaching its validity."

No other questions call for notice.

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 8, 1911.

Beatty, C. J., dissented from the order denying a hearing in the supreme court, and filed the following opinion thereon:

BEATTY, C. J.—I dissent from the order denying a rehearing. There was a plain and direct issue as to the assign-

ment of the note given by defendant to Studebaker Brothers Company, and the plaintiff was bound to make proof of that fact. In my opinion the proof was wholly insufficient. According to the weight of authority the treasurer of a trading corporation has no power as such to indorse the negotiable paper of the corporation for sale or discount, and here was no evidence of a special authority—no evidence even that Weaver was treasurer—no evidence of the genuineness of his signature. To hold that the assignment was proved in this case is, in my opinion, to establish a dangerous precedent.